**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

**BARRINGTON REALTY, LLC, and**
**PCH REALTY, LLC**

    **Plaintiffs,**

**v.**                                                    **No. 20-cv-01366-JCH-KK**

**CAPITAL FUND SECURITIES, LIMITED,**

    **Defendant.**

<u>**MEMORANDUM OPINION AND ORDER**</u>

A 2003 contract defines the interests that Barrington Realty, PCH Realty, and Capital Fund Securities ("CFS") have in ten wrap notes. Barrington and PCH claim a right to fifty percent of all proceeds from the wrap notes, even if those proceeds arise after CFS collects on the collateral securing the wrap notes. CFS, by contrast, contends that Barrington and PCH have a right to fifty percent of only the proceeds that are from a sale, refinancing, or cash flow for the wrap notes. And if CFS collects on the collateral securing the wrap notes, then CFS asserts that Barrington and PCH's interests are no longer.

The parties cross moved for summary judgment. *See Capital Fund Securities' Motion for Summary Judgment* (ECF No. 45); *Plaintiffs' Motion for Partial Summary Judgment* (ECF No. 46). Because each party offers a reasonable interpretation of the 2003 contract, the Court will deny each party's motion.

**I.**    **Background**

<u>Mr. Pike and Raintree Work Together;</u>
<u>The 1982-83 Participation Agreements</u>

In the early 1980s, Hugh Pike owned apartment properties in New Mexico and Texas. He sold each apartment property to a separate limited partnership. Mr. Pike issued wrap notes to

1

secure the debt that the limited partnerships owed from the sales. Each wrap note's collateral is an ownership interest in the property-owning entity; the practical effect of this allows the wrap note's holder to foreclose on the property upon maturity. *See* Pffs.' Mot. for Partial Summary J. 2-4, ¶¶ 1-7 (ECF No. 46); Def.'s Resp. 1-2, ¶¶ 1-7 (ECF No. 49); Def.'s Mot. for Summary J. 2 n.1, 7 ¶¶ 1-2 (ECF No. 45); Pffs.' Resp. 2 (ECF No. 50); *see also* Def.'s Ex. H (ECF No. 45-8) (example wrap note); Def.'s Ex. I, at 2, ¶ 1.A (ECF No. 45-9) (defining collateral).

Raintree Corporation assisted Mr. Pike with the apartment property transactions. Mr. Pike granted participation rights in the wrap notes to Raintree. The two executed participation agreements for the wrap notes. One provision in the participation agreements recognized that Raintree had a "50% interest in that portion of the [wrap notes] that represents Contract Equity including a 50% interest in all Collateral that secures the [wrap notes]." Def.'s Ex. A, at 2, ¶ 2 (ECF No. 45-1) (example participation agreement); *see* ECF No. 46, at 4, ¶¶ 8-10; ECF No. 49, at 2, ¶¶ 8-10; ECF No. 45, at 7 ¶ 3; ECF No. 50, at 2.

RIA and Mr. McKeon Become Involved;
The 1996 Memorandum of Understanding and the 1996 Agency Agreement

Mr. Pike assigned some or all of his interests in the wrap notes to RIA Land Company and RIA Finance and Investments Limited (collectively, "RIA"). RIA obtained a loan from Overseas Trust Bank ("OTB"), defaulted on the loan, and fell into receivership. So in 1991, OTB appointed George McKeon as receiver over some of RIA's assets, including RIA's interests in the wrap notes. *See* ECF No. 46, at 5, ¶¶ 11-13; ECF No. 49, at 2, ¶¶ 11-13.

Mr. McKeon and Raintree entered into the 1996 Memorandum of Understanding (signed by Raintree and Mr. McKeon in his capacity as the receiver) and the 1996 Agency Agreement (signed by Raintree, Mr. McKeon in his capacity as the receiver, Mr. McKeon in his individual capacity, and two other corporations). The 1996 Memorandum of Understanding divided (not in

2

a fifty-fifty manner) proceeds of (1) initial refinancings, (2) operations and further refinancings, and (3) "all other proceeds attributable to any and all other sources received by the Agent." Def.'s Ex. B, at 1-2, ¶¶ 1-3 (ECF No. 45-2) (1996 Memorandum of Understanding).[1] And the 1996 Agency Agreement noted that "Raintree owns a fifty (50%) interest in the Notes and a fifty percent (50%) interest in the collateral securing the Notes." Pffs.' Ex. 8, at 1, ¶ 2 (ECF No. 46-8) (1996 Agency Agreement); *see* ECF No. 46, at 5-6, ¶ 14; ECF No. 49, at 2, ¶ 14.

CFS Becomes Involved;
The 1998 Agreement

In 1997, Mr. McKeon formed CFS. CFS purchased RIA's interests in the wrap notes. Mr. McKeon acted on RIA's behalf during these transactions in his capacity as RIA's receiver. *See* ECF No. 46, at 6, ¶ 16; ECF No. 49, at 2, ¶ 16.[2]

CFS, Raintree, and Mr. McKeon (in his capacity as RIA's receiver) entered into the 1998 Agreement. The 1998 Agreement provided that CFS would receive the first $0.5 million from funds disbursed on a specific wrap note's accounts. After that initial payment, fifty percent of funds disbursed from that wrap note, plus fifty percent of proceeds attributable to any of the wrap notes, would go to CFS until CFS received a total of $4.4 million. (The $4.4 million cap included the initial $0.5 million payment.) And after that, CFS had a right to five percent "of the

---

[1] The 1996 Memorandum of Understanding and the 1996 Agency Agreement referred to Mr. McKeon as "the Agent" when he acted in an individual capacity. *See* ECF No. 45-2, at 1 (1996 Memorandum of Understanding); ECF No. 46-8, at 1 (1996 Agency Agreement).

[2] Barrington and PCH contend that "CFS cannot substantiate that it holds good title to all of the Notes." ECF No. 50, at 2, ¶ D-UMF 4. This dispute is not material. The parties do not ask the Court to determine the wrap notes to which CFS holds title. *See, e.g.*, ECF No. 46, at 5, ¶ 11, n.3 ("For purposes of this [motion for summary judgment] only, Plaintiffs have not attempted to challenge CFS's claim (for example) that it properly acquired title to **all** of the Wrap Notes.").

Rather, the parties ask the Court to construe an exemplar wrap note. *See* ECF No. 45, at 7, ¶ 1; ECF No. 46, at 3, ¶ 4 n.2. The Court's construction of the language—which the Court holds to be ambiguous—thus applies to all of the wrap notes in this dipute to which CFS holds title. As a result, Barrington and PCH preserve the right to challenge CFS's title in specific wrap notes.

net proceeds from a sale or refinancing paid on account of any of the other Notes." Def.'s Ex. E, at 1-2, ¶¶ 1-3 (ECF No. 45-5) (1998 Agreement); *see* ECF No. 45, at 7, ¶ 7; ECF No. 50, at 2; ECF No. 46, at 6, ¶ 17; ECF No. 49, at 2, ¶ 17.

The 1998 Agreement included a merger clause that extinguished the 1996 Memorandum of Understanding and the 1996 Agency Agreement. *See id.* at 3, ¶ 9 ("Upon execution of this Agreement, the Memo of Understanding, dated September 19, 1996 and the Agency Agreement, dated September 20, 1996, between Raintree and Receiver shall be canceled and of no further force or effect.").

<u>The 2003 Agreement</u>

In 2002, Raintree, CFS, Mr. Pike, and RIA disputed the parties' interests in the wrap notes. So they entered the 2003 Agreement. James Duff, an attorney for Mr. Pike and RIA, prepared and circulated the initial draft. *See* ECF No. 46, at 6-7, ¶¶ 19-22; ECF No. 49, at 2-3, ¶¶ 19-22; ECF No. 45, at 7-8, ¶¶ 8-10; ECF No. 50, at 3-5, ¶¶ D-UMF 8-10, ¶ AMF G; Def.'s Reply 3-4, ¶¶ 9-10, G (ECF No. 56); *see also* Pffs.' Ex. 28 (ECF No. 50-6) (fax from Mr. Duff).

Reproduced here are material provisions from the 2003 Agreement:

- <u>Recital A</u>: CFS is the current holder of certain All-Inclusive Residual Notes and Agreement as more particularly described on Exhibit "A" hereto (collectively referred to herein as the "Notes") which include promises to pay certain funds from the operation of the apartment projects (as defined below).

- <u>Recital K</u>: It is the desire of the parties hereto to refinance the first mortgages of each of the above APARTMENT PROJECTS and to distribute the proceeds from the refinancing, sale, or cash flow in proportion to each party's ownership interest in the Notes, as set forth on Exhibit "A", for the purpose of reducing the amount owed on the Notes.

- <u>Recital F</u>: In order to resolve such disputes and give all parties incentive to work to obtain refinancing of the mortgage loans on the apartment projects, CFS and RAINTREE agree to recognize certain participation interests by PIKE in certain of the Notes.

- <u>Paragraph 2</u>: Pursuant to the representations, terms, and limitations in this AGREEMENT, including without limitation the provisions of paragraph 6 herein, CFS, as the holder of the Notes, grants PIKE and REALTY participation rights in the Notes as set forth and only as set forth in Exhibit "A".

- <u>Paragraph 4</u>: Refinancings of the APARTMENT PROJECTS shall be on the following terms:
  a. The fee owners of the APARTMENT PROJECTS shall retain all of the existing reserve accounts.

- <u>Paragraph 7</u>: The participation in proceeds of each of the All-Inclusive Residual Notes for each apartment project is set forth in Exhibit "A".

- <u>Paragraph 8</u>: Proceeds from any refinancing, sale, or cash flow for the Notes shall be distributed directly from escrow to the Wrap Note Lenders in accordance with the percentage interests listed on Exhibit "A".

- <u>Paragraph 13</u>: No modification of this AGREEMENT or any part thereof shall be valid or binding upon the parties hereto, unless in writing signed by the parties. This document constitutes the entire agreement between the parties and supersedes all prior agreements, discussions, representations, and/or negotiations.

- <u>Paragraph 17</u>: RAINTREE disclaims any interest in the Notes for SIERRA VERDE or COLUMBUS MANOR or the SIERRA VERDE or COLUMBUS MANOR apartment projects and represents and warrants that it has not sold, transferred, or assigned any right, title, or interest in the Notes to any other party and agrees to indemnify and hold harmless CFS, PIKE, and REALTY from any claims to the Notes or the proceeds thereof by, through, or under RAINTREE.

Def.'s Ex. G (ECF No. 45-7) (2003 Agreement). Exhibit A to the 2003 Agreement provides "distribution shares" for nineteen apartment properties. The exhibit lists Raintree's shares as fifty percent for the ten wrap notes in dispute here. *See id.* at 11.

Barrington and PCH Become Involved;
The 2007 Agreement and the 2007 Assignments

In 2007, Raintree assigned its participation rights in sixteen of the apartment properties from the 2003 Agreement to Barrington and PCH. Raintree, Barrington, and PCH's 2007 Agreement stated that Raintree was "the owner of a right to participate . . . in the receipt of sales', refinance and cash flow proceeds from the Notes, all as is more particularly described in

5

[the 2003 Agreement]." Def.'s Ex. K, at 1 (ECF No. 45-11) (2007 Agreement); *see* ECF No. 46, at 8, ¶ 26; ECF No. 49, at 3, ¶ 26; ECF No. 45, at 8, ¶¶ 14-16; ECF No. 50, at 2, 4, ¶ D-UMF 16.

The parties signed assignments that same day. The 2007 Assignments stated that Raintree was conveying "a 50% ownership interest in and to the Raintree Participation Right and in all rights and remedies in connection therewith (including, without limitation, the rights to principal and interest payments) and all collateral and security therefor as set forth in the applicable Security Agreement." Pffs.' Ex. 18(A), at 1, ¶ 1 (ECF No. 46-18) (2007 Assignment to PCH); Pffs.' Ex. 18(B), at 1, ¶ 1 (ECF No. 46-19) (2007 Assignment to Barrington).

### The 2016 Email

In 2016, Mr. McKeon (writing for CFS) emailed Barrington and PCH's manager. He wrote, "Raintree has a 50% interest in 'Contract Equity' and the 'Collateral,' by a separate contract on each Note." Pffs.' Ex. 19, at 2 (ECF No. 46-20); *see* ECF No. 46, at 29; ECF No. 49, at 4, ¶ 29; Pffs.' Reply 3, ¶ UMF 29 (ECF No. 57); ECF No. 50, at 6, ¶¶ AMF L, M.

### The Present Dispute

As the wrap notes' maturity dates approached, Barrington and PCH contacted CFS to discuss realizing on the wrap notes. CFS denied that Barrington and PCH had any interests in the wrap notes after maturity. Barrington and PCH sued. *See* ECF No. 46, at 9-10, ¶¶ 30-35; ECF No. 49, at 4-5, ¶¶ 30-35.

The plaintiffs sought a declaratory judgment that Raintree (and thus Barrington and PCH) "has the right to receive 50 percent of the proceeds from (i) the payoff of the Wrap Notes upon maturity (including principal and accrued interest), or (ii) the proceeds of any remedies undertaken with respect to the collateral, in the event the Wrap Notes are not paid off." Compl. 8, ¶ 41 (ECF No. 1). The plaintiffs also alleged and sought remedies for a breach of contract. *Id.* at 9, ¶¶ 50-51. Finally, the plaintiffs sought attorneys' fees. *Id.* at 10, ¶ 55.

The dispute boils down to conflicting interpretations of the 2003 Agreement. The parties cross moved for summary judgment, each advancing their own interpretation. As the motions were pending, the parties resolved their dispute over six of the wrap notes. *See* Pffs.' Suppl. 2-3, ¶¶ 3-4 (ECF No. 69). Ten wrap notes remain in dispute: Abo, Cedar Hills, Clovis I, Clovis II, Dona Ana Park II, Grants, Hobbs, Quay, Santa Rosa, and Trans Mountain. *See id.* at 3, ¶ 4.

## II.    Standards

This case invokes diversity jurisdiction. The Court thus applies the substantive law of New Mexico. *See Stickley v. State Farm Mut. Auto. Ins. Co.*, 505 F.3d 1070, 1076 (10th Cir. 2007). And under New Mexico law, whether a contract is ambiguous—that is, "whether a contractual provision is susceptible to reasonable but conflicting meanings"—is a question of law. *Krieger v. Wilson Corp.*, 2006-NMCA-034, ¶ 12, 131 P.3d 661 (citing *C.R. Anthony Co. v. Loretto Mall Partners*, 1991-NMSC-070, ¶ 17, 817 P.2d 238). But if contractual language is ambiguous, then "the ultimate factual issues must be resolved by the appropriate fact finder with the benefit of a full evidentiary hearing." *Id.* (quoting *C.R. Anthony Co.*, 1991-NMSC-070, ¶ 17).

To determine whether contractual language is ambiguous, courts "may consider collateral evidence of the circumstances surrounding the execution of the agreement." *Mark V, Inc. v. Mellekas*, 1993-NMSC-001, ¶ 12, 845 P.2d 1232; *see also C.R. Anthony Co.*, 1991-NMSC-070, ¶ 15 ("[I]n determining whether a term or expression to which the parties have agreed is unclear, a court may hear evidence of the circumstances surrounding the making of the contract and of any relevant usage of trade, course of dealing, and course of performance." (footnote omitted)).

While state law governs the substance of this dispute, federal law governs the standards for granting or denying summary judgment. *See Kan. Penn Gaming, LLC v. HV Props. of Kan., LLC*, 662 F.3d 1275, 2184 (10th Cir. 2011). And under federal law, summary judgment is

warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986). Even though both parties moved for summary judgment, "summary judgment is inappropriate if disputes remain as to material facts." *Christian Heritage Acad. v. Okla. Secondary Sch. Activities Ass'n*, 483 F.3d 1025, 1030 (10th Cir. 2007) (citing *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000)). A court should treat the cross motions separately; "the denial of one does not require the grant of another." *Id.* (quoting *Buell Cabinet Co. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979)).

For each motion, the movant "bears the initial burden of making a prima facie demonstration of the absence of a genuine issue of material fact and entitlement to judgment as a matter of law." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). If the movant meets this burden, the burden shifts to nonmovant. *See id.* Then, to survive summary judgment, the nonmovant would need to "go beyond the pleadings and set forth specific facts showing that there is a genuine issue for trial." *Sally Beauty Co. v. Beautyco, Inc.*, 304 F.3d 964, 971-72 (10th Cir. 2002).

A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248-50. And an issue is genuine if the evidence might lead a reasonable jury to return a verdict for the nonmovant. *See Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1215 (10th Cir. 2013). Finally, a court "construe[s] the evidence and the reasonable inferences drawn therefrom in the light most favorable to the nonmovant." *Sally Beauty Co.*, 304 F.3d at 971.

The questions of whether a contract is ambiguous and whether an issue is genuine demand similar inquiries. Recall that a contract is ambiguous if it is susceptible to reasonable but conflicting meanings. *See Krieger*, 2006-NMCA-034, ¶ 12. And an issue is genuine if it is

susceptible to reasonable but conflicting verdicts. *See Tabor*, 703 F.3d at 1215. This parallelism allows New Mexico law on ambiguity and the federal summary judgment standard to converge.

For each motion, therefore, the movant has the initial burden of making a prima facie case that its interpretation of the contract is reasonable. The burden would then shift to the nonmovant. And the nonmovant would need to set forth specific facts showing that its conflicting interpretation of is also reasonable. Doing so would demonstrate both ambiguity and a genuine issue of material fact. Summary judgment for the movant would thus be inappropriate.

## III.  Discussion

Three issues predominate this dispute. First, did the 2003 Agreement's merger clause extinguish all of the parties' prior interests in the wrap notes? Second, what rights and obligations attach to CFS's role as the "holder" of the wrap notes? And third, does the 2003 Agreement limit Barrington and PCH's interests *only* to the proceeds of a cash flow, sale, or refinancing for the wrap notes?

### A.  The 2003 Agreement's Merger Clause

CFS asserts that the 2003 Agreement "is the only agreement regarding distribution of funds from the Wrap Notes that is still in effect." ECF No. 45, at 10. CFS relies on the plain language of paragraph 13 of the 2003 Agreement: "This document constitutes the entire agreement between the parties and supersedes all prior agreements, discussions, representations, and/or negotiations." ECF No. 45-7, at 6, ¶ 13. If CFS is correct, then the 2003 Agreement extinguished Raintree's prior interests—whether those interests arose from the 1982-83 Participation Agreements, the 1996 Memorandum of Understanding, the 1996 Agency Agreement, or the 1998 Agreement.

Barrington and PCH disagree. They contend that Raintree's interests in the wrap notes both preceded and survived the 2003 Agreement. *See* ECF No. 46, at 18; ECF No. 50, at 12. For CFS's interpretation to be correct—thus leaving Raintree with fewer interests after the 2003 Agreement—Barrington and PCH contend that Raintree would have needed to explicitly grant its prior interests to CFS. *See* ECF No. 50, at 12. And according to Barrington and PCH, the 2003 Agreement did not so grant Raintree's prior interests to CFS. As a result (say Barrington and PCH), CFS's interpretation must be incorrect and Raintree's prior interests survived the 2003 Agreement. *See id.* at 12. Barrington and PCH identify that CFS claims that the 2003 Agreement is effectively a novation—the substitution of an old contract with a new one. *See id.* at 11.

CFS has the better argument. The 2003 Agreement is explicit when it says, "This document constitutes the entire agreement between the parties and *supersedes* all prior agreements." ECF No. 45-7, at 6, ¶ 13 (emphasis added). By its plain terms, the 2003 Agreement extinguished the 1982-83 Participation Agreements, the 1996 Memorandum of Understanding, the 1996 Agency Agreement, and the 1998 Agreement.

And if Barrington and PCH assert that the Court needs to hold that the 2003 Agreement is a novation for the agreement to extinguish the parties' prior agreements, then the Court so holds. The elements of a novation are "(1) an existing a valid contract, (2) an agreement to the new contract by all parties, (3) a new valid contract, and (4) an extinguishment of the old contract by the new one." *Sims v. Craig*, 1981-NMSC-046, ¶ 6, 627 P.2d 875. The 2003 Agreement satisfies these elements. The 1982-83 Participation Agreements were existing and valid contracts between Mr. Pike and Raintree. *See, e.g.*, ECF No. 45-1, at 1. So too, the 1998 Agreement was an existing

and valid contract that included CFS and Raintree. *See* ECF No. 45-5, at 1.[3] Second, CFS and Raintree signed the 2003 Agreement. *See* ECF No. 45-7, at 8-9. Third, the 2003 Agreement was a new and valid contract—no one disputes this fact. Fourth, paragraph 13 of the 2003 Agreement explicitly extinguished all prior contracts between the parties. And the merger clause's use of possible boilerplate language does not defeat its extinguishing effect. *See Drs. Assocs. Inc. v. Carbonell*, No. 33,997, mem. op. ¶¶ 17-20, 2015 WL 4380284 (N.M. Ct. App. June 29, 2015) (holding boilerplate merger clause sufficient to extinguish arbitration provision in prior contract).

The Court will not disturb Raintree's and CFS's clear intentions: the 2003 Agreement displaced all prior agreements and thus governs this dispute. *CC Hous. Corp. v. Ryder Truck Rental, Inc.*, 1987-NMSC-117, ¶ 6, 746 P.2d 1109 ("When discerning the purpose, meaning, and intent of the parties to a contract, the court's duty is confined to interpreting the contract that the parties made for themselves, and absent any ambiguity, the court may not alter or fabricate a new agreement for the parties."). But this does not mean that the parties' prior agreements are irrelevant. After all, the parties' course of dealing and course of performance may be evidence of whether other provisions in the 2003 Agreement are ambiguous. *See C.R. Anthony Co.*, 1991-NMSC-070, ¶ 15. Still, it is the 2003 Agreement—rather than prior agreements—that controls.

**B.      CFS's Status as Holder**

The parties next dispute the rights and obligations that attach to CFS's status as holder of the wrap notes. To be sure, the 2003 Agreement makes clear that CFS *is* the holder. *See, e.g.*, ECF No. 45-7, at 1, 3, ¶¶ A, 2. Barrington and PCH do not dispute this designation. *See* ECF No. 50, at 10-11. Rather, the parties disagree over what this designation entails.

---

[3] The 1998 Agreement extinguished the 1996 Memorandum of Understanding between Raintree and Mr. McKeon and the 1996 Agency Agreement that included Raintree and Mr. McKeon. *See* ECF No. 45-5, at 3, ¶ 9.

In fact, the parties' disagreement does not matter here. CFS says, "As the holder of the Note[s], CFS has the right to all proceeds generated by Note except to the extent it has agreed to otherwise distribute proceeds via a separate agreement (like the 2003 Agreement)." ECF No. 45, at 11. And Barrington and PCH say, "Although CFS's designation as a holder may mean it can play the lead role in enforcing the Wrap Notes, CFS's holder status does not immunize it from liability from claims of participants in the Wrap Note." ECF No. 50, at 11. The parties are thus on the same page. If CFS previously agreed to distribute proceeds to other participants—that is, if CFS is liable to participants' claims—then CFS must fulfill its agreements.

### C.    Limitations (if any) on Barrington and PCH's Interests

What did CFS agree to distribute to Raintree? The parties answer differently, but they each do so based on a reasonable interpretation of the 2003 Agreement—especially when the Court views the evidence in the light most favorable to the party offering the interpretation. *See Sally Beauty Co.*, 304 F.3d at 971. And because each party offers a reasonable interpretation, each party necessarily meets (1) its initial burden on its own motion for summary judgment and (2) its shifted burden on the other party's motion for summary judgment. In the end, therefore, the Court will deny both motions for summary judgment. *See Sprint Nextel Corp. v. Middle Man, Inc.*, 822 F.3d 524, 530, 532-34 (10th Cir. 2016) (recognizing reasonableness of conflicting contractual interpretations before holding summary judgment to be inappropriate).

#### 1.    CFS's Interpretation

CFS argues that the 2003 Agreement limits the proceeds owed to Raintree (and thus to Barrington and PCH). In particular, CFS points to recital K and paragraph 8. *See* ECF No. 45-7, at 3, ¶ K ("It is the desire of the parties . . . to distribute the proceeds from the refinancing, sale, or cash flow in proportion to each party's ownership interest in the Notes . . . ."); *id.* at 5, ¶ 8

("Proceeds from any refinancing, sale, or cash flow for the Notes shall be distributed directly from escrow to the Wrap Note Lenders in accordance with the percentage interests listed in Exhibit 'A'."). These provisions, according to CFS, limit Raintree's interests *only* to proceeds of a sale, proceeds of a refinancing, or proceeds of a cash flow. *See* ECF No. 45, at 11.

Some examples are helpful. If one of the property-owning entities sells its apartment and uses the proceeds to pay off a wrap note, then CFS acknowledges that it must share those proceeds with Barrington and PCH. *See* ECF No. 49, at 6. So too, if a property-owning entity refinances and uses the refinancing to pay off a wrap note, then CFS would share those proceeds with Barrington and PCH as well. *Id.* And if a property-owning entity receives excess operational income and distributes that excess income as cash flow to pay off a wrap note, then CFS would also share those proceeds. *See* ECF No. 56, at 11 n.1.[4]

CFS draws a line—and this dispute heats up—with proceeds that are not from a sale, refinancing, or cash flow for the wrap notes. For example, if CFS collects on the collateral (the property-owning entities), then CFS contends that it has broad discretion to realize value from the collateral, and it need not share that value with Barrington and PCH. *See* ECF No. 49, at 6-7.[5]

---

[4] CFS has abandoned maturity as the dividing line between the interests that CFS must share with Barrington and PCH and the interests that CFS can keep for itself. *See* ECF No. 49, at 7. CFS now acknowledges that if a wrap note is paid off via a sale, refinance, or cash flow *after maturity*, then it will share those proceeds with Barrington and PCH. *See id.* Thus, the question presented is not whether Barrington and PCH have interests after maturity. Rather, the question presented is whether Barrington and PCH have interests that extend beyond proceeds from any refinancing, sale, or cash flow for the notes.

[5] Barrington and PCH contend that if "CFS (a) successfully enforces the Wrap Notes by taking over the limited partnerships, (b) then operates the apartment properties through the partnerships, (c) then obtains cash flow from the partnerships, that cash flow will constitute proceeds from the Wrap Notes." ECF No. 57, at 6. CFS has the better argument: if CFS is correct that Barrington and PCH's interests are limited to "proceeds from any refinancing, sale, or cash flow for the Notes," then Barrington and PCH do not have any rights to cash flow from CFS's operations of the apartment properties *after* CFS collects on the collateral.

Or if a property-owning entity paid off a wrap note with a non-sale lump-sum payment before maturity, then CFS claims that it would not need to share those proceeds with Barrington and PCH. *See id.* at 7 n.2. In CFS's interpretation of the 2003 Agreement, CFS need not share these kinds of proceeds with Barrington and PCH. Sufficient evidence—when viewed in the light most favorable to CFS—shows that CFS's interpretation is reasonable.[6]

### a.    CFS's Surplusage Argument

CFS highlights that every provision of the contract must have meaning. *See* ECF No. 49, at 11 (citing *Mayfield Smithson Ent. v. Com-Quip, Inc.*, 1995-NMSC-034, ¶ 17, 896 P.2d 1156 (interpreting contract to avoid surplusage)). To avoid rendering recital K and paragraph 8 surplusage—contends CFS—these provisions must limit Raintree's (and thus its successors) interests. According to CFS, if the parties to the 2003 Agreement intended to distribute all proceeds from the wrap notes, then presumably the contract would have said so. Or (in CFS's view) the contract would have at least avoided specifying which proceeds were to be distributed. Paragraph 8, for example, could have read:

> Proceeds from the Notes shall be distributed directly from escrow to the Wrap Note Lenders in accordance with the percentage interests listed on Exhibit 'A'.

Rather, paragraph 8 reads:

---

Paragraph 8, for example, does not call for the distribution of "all proceeds," "proceeds from any collateral," or even "proceeds from any cash flow for the collateral." *Cf., e.g.*, ECF No. 45-1, at 2, ¶ 2 (example participation agreement) (recognizing that Raintree's interest included "a 50% interest in all Collateral that secures the [wrap notes]"); ECF No. 46-8, at 1, ¶ 2 (1996 Agency Agreement) (specifying that "Raintree owns . . . a fifty percent (50%) interest in the collateral securing the Notes"). Thus, if CFS is correct that paragraph 8 is a limitation on Barrington and PCH's interests, then that limitation extends to what CFS must share *after CFS collects* on the collateral. After all, once CFS collects on the collateral, the wrap notes will be satisfied.

[6] As this litigation proceeds, the parties should not overly rely on the facts that the Court points to for why CFS's interpretation is reasonable. The Court's citation to a fact does not mean that the fact would be dispositive at trial. So too, the Court's omission of a fact does not mean that the fact would be immaterial at trial.

> Proceeds from *any refinancing, sale, or cash flow* for the Notes shall be distributed directly from escrow to the Wrap Note Lenders in accordance with the percentage interests listed on Exhibit 'A'.

ECF No. 45-7, at 5, ¶ 8 (emphasis added). CFS correctly notes that the Court must give effect to "any refinancing, sale, or cash flow." *See, e.g.*, *Mayfield Smithson Ent.*, 1995-NMSC-034, ¶ 17. And when the Court views the evidence in the light most favorable to CFS, it is reasonable to interpret these words as limiting the proceeds that CFS must share.[7]

### b. Prior Language

The three prior contracts between the parties (or their predecessors) divvied up *all* proceeds from the wrap notes. *See* ECF No. 45, at 12-14. The 1982-83 Participation Agreements read, in part, "Seller agrees to share with Participant *any and all* sums received by Seller from the sale of the Project to Purchaser." ECF No. 45-1, at 1, ¶ B (emphasis added). The 1996 Memorandum of Understanding divided proceeds of (1) initial refinancings, (2) operations and further refinancings, and (3) "*all other proceeds attributable to any and all other sources received by the Agent.*" ECF No. 45-2, at 1-2, ¶¶ 1-3 (emphasis added). The 1996 Agency Agreement noted that "Raintree owns a fifty (50%) interest in the Notes and a fifty percent (50%) interest in the collateral securing the Notes." ECF No. 46-8, at 1, ¶ 2. And the 1998

---

[7] Barrington and PCH offer different interpretations of recital K and paragraph 8. Their interpretations are reasonable when the Court reads the 2003 Agreement in the light most favorable to Barrington and PCH.

For recital K, Barrington and PCH point to the provision's purposive language: "It is the desire of the parties . . . to distribute the proceeds from the refinancing, sale, or cash flow in proportion to each party's ownership interest in the Notes . . . *for the purpose of reducing the amount owed on the notes.*" ECF No. 45-7, at 3, ¶ K (emphasis added). The final clause, according to Barrington and PCH, indicates what the parties hope to accomplish by distributing the proceeds from refinancings, sales, or cash flow. *See* ECF No. 57, at 10. Recital K thus serves to express the parties' intentions rather than delineate limitations on what CFS must share.

For paragraph 8, Barrington and PCH point to the clause expressing how the distributions shall be made: "Proceeds from any refinancing, sale, or cash flow for the Notes shall be *distributed directly from escrow to the Wrap Note Lenders . . . .*" ECF No. 45-7, at 5, ¶ 8 (emphasis added). This language—rather than limiting Raintree's interests—merely expresses how Raintree should be paid for certain types of distributions. *See* ECF No. 57, at 9-10.

Agreement noted that, up to certain caps, CFS and Raintree were to equally divide "*all such proceeds*" from "proceeds attributable to any of the Notes." ECF No. 45-5, at 2, ¶ 2 (emphasis added). Then after the caps were reached, CFS remained entitled to five percent "of the net proceeds from a sale or refinancing." *Id.* ¶ 3.

These prior contracts show the parties' capabilities. In particular, this language shows that if the parties wanted to divide *all* proceeds in the 2003 Agreement, then they would have said so—just as they did in the past. So too, the 1998 Agreement is telling for its distinction between sharing "all proceeds" and "proceeds from a sale or refinancing." Viewing this distinction in the light most favorable to CFS suggests that the 2003 Agreement's use of "any refinancing, sale, or cash flow" is limiting language, similar to the 1998 Agreement's use of "proceeds from a sale or refinancing."[8]

### c.   Difference Between the 1998 and 2003 Agreements

Next consider a difference between the 1998 and 2003 Agreements. For the wrap notes in the 1998 Agreement, CFS and Raintree shared proceeds fifty-fifty that were "attributable to any of the Notes," up to $4.4 million. ECF No. 45-5, at 2, ¶ 2.[9] The 2003 Agreement, by contrast, modified the division of proceeds (either all proceeds, as Barrington and PCH contend, or limited

---

[8] Barrington and PCH highlight that James Duff, an attorney for Mr. Pike and RIA, prepared and circulated the initial draft of the 2003 Agreement. *See* ECF No. 50, at 5, ¶ AMF G. The plaintiffs contend that CFS has not established that Mr. Duff knew of the parties' specific phrasing in the prior agreements. *See id.* at 17.

When the Court views the evidence in the light most favorable to Barrington and PCH, Mr. Duff's potential ignorance of the parties' previous terms suggests that any differences between the terms of the 2003 Agreement and the prior agreements should carry less weight.

But when CFS benefits from the most-favorable light, the differences in the terms support CFS. After all (when viewing the evidence in the most-favorable light to CFS), an attorney who drafted a contract with a merger clause would presumably have paid special attention to phrases in the parties' prior agreements. And the decision to use different phrases would thus imply that the parties intended to achieve different results.

[9] The wrap note for Mountain View I strayed from this distribution. *See* ECF No. 45-5, at 1, ¶ 1.

proceeds, as CFS contends) for ten of the wrap notes in this way: Raintree received fifty percent, RIA (called "Realty" in the 2003 Agreement) received twenty-five percent, and CFS received twenty-five percent. *See* ECF No. 45-7, at 11.

This evidence shows—according to CFS—that CFS accepted a detriment in the 2003 Agreement. After all, CFS received fifty percent of proceeds from the wrap notes under the 1998 Agreement (up to the $4.4 million cap); after the 2003 Agreement, CFS received only twenty-five percent of proceeds in ten of the wrap notes while Raintree continued to receive fifty percent. CFS argues that the benefit of this bargain was a limitation on the types of proceeds that CFS would later need to share with Raintree. *See* ECF No. 49, at 17-18. In other words, CFS argues that in exchange for reducing from fifty percent to twenty-five percent its share of proceeds from "any refinancing, sale, or cash flow," CFS would later receive all proceeds that were not from "any refinancing, sale, or cash flow." This evidence, when viewed in the light most favorable to CFS, supports the reasonableness of CFS's interpretation—that the 2003 Agreement limits the proceeds that CFS must share with Barrington and PCH to proceeds from "any refinancing, sale, or cash flow."[10]

> ### d. The 2007 Agreement

Finally, the 2007 Agreement between Raintree, Barrington, and PCH supports CFS's interpretation (when the Court views the 2007 Agreement in the light most favorable to CFS). Raintree represented to Barrington and PCH that Raintree was "the owner of a right to

---

[10] Barrington and PCH offer a different theory of the consideration each party gave in the 2003 Agreement. They highlight that Raintree (1) recognized Mr. Pike's rights in certain wrap notes, (2) relinquished its interest in two of the wrap notes, (3) agreed to indemnify the other parties for various claims, and (4) consented to a system of refinancing that allowed the property-owning entities to retain reserve accounts in connection with refinancings. *See* ECF No. 57, at 11; *see also* ECF No. 45-7, at 2, 4, 7, ¶¶ F, 4(a), 17.

When the plaintiffs benefit from the Court viewing the evidence in the light most favorable to them, the difference between the 1998 and 2003 Agreements is less helpful to CFS.

participate . . . in the receipt of sales', refinance and cash flow proceeds from the Notes, all as is more particularly described in [the 2003 Agreement]." ECF No. 45-11, at 1. The 2007 Agreement thus uses substantially the same language from the 2003 Agreement that CFS claims to be limiting language—that is, specifying (and in CFS's view, limiting) that Raintree can participate in proceeds from sales, refinancings, and cash flow for the wrap notes. *See* ECF No. 45, at 15-16.

What is more, Barrington and PCH paid Raintree $1 million for the latter's interests in the 2003 Agreement. *See* ECF No. 45-11, at 1, ¶ 1. Barrington and PCH now estimate that the wrap notes are worth $40 to $50 million and state that their claim is for half of that amount ($20 to $25 million). *See* Pffs.' Ex. 31, at 3, ¶ 1 (ECF No. 50-9) (plaintiffs' initial disclosures). Barrington and PCH's current estimate comes with their contention that their interests are not limited to proceeds from sales, refinancings, and cash flow for the wrap notes. CFS views the jump from $1 million to $20 to $25 million to indicate that, in 2007, the parties understood that Raintree's interests from the 2003 Agreement to be limited to proceeds from sales, refinancings, and cash flow. *See* ECF No. 45, at 16. Put differently, if the value of *all* proceeds from the wrap notes is now worth $40 to $50 million, then CFS asserts that Raintree would have sold its interests for more than $1 million in 2007. And because Raintree did not sell its interests for more than $1 million, CFS concludes that Barrington and PCH do not have a claim to half of *all* proceeds from the wrap notes. This discrepancy, when viewed in the light most favorable to CFS, bolsters the reasonableness of CFS's interpretation.[11]

---

[11] Just as the language and purchase price of the 2007 Agreement helps CFS, the language of the 2007 Assignments helps Barrington and PCH. The assignments state that Raintree was conveying "a 50% ownership interest in and to the Raintree Participation Right and in all rights and remedies in connection therewith (including, without limitation, the rights to principal and interest payments) and all collateral and security therefor as set forth in the applicable Security

e.      *Conclusion to CFS's Interpretation*

CFS offers a reasonable interpretation of the 2003 Agreement: Barrington and PCH have a right to fifty percent of only the proceeds that are from a sale, refinancing, or cash flow for the wrap notes, and Barrington and PCH have no interest in proceeds derived from the collateral after CFS collects on it.

CFS thus meets its initial burden on its motion for summary judgment. By providing a reasonable interpretation, CFS makes a prima facie showing that it is entitled to judgment as a matter of law. And when CFS benefits from the Court viewing the evidence in the light most favorable to it, CFS survives Barrington and PCH's motion for summary judgment. That is, by providing a reasonable conflicting interpretation to Barrington and PCH's interpretation, CFS highlights a genuine issue of material fact.

## 2.      Barrington and PCH's Interpretation

Barrington and PCH do not read the 2003 Agreement as a limitation on their interests. To the contrary, the plaintiffs read the 2003 Agreement as recognizing Raintree's (and thus their) right to share in all proceeds from the wrap notes. And where CFS has paragraph 8 and recital K, Barrington and PCH have paragraph 7. That paragraph broadly states, "The participation in proceeds of each of the All-Inclusive Residual Notes for each apartment project is set forth in Exhibit 'A'." Doc. 45-7, at 5, ¶ 7. Exhibit A lists Raintree's shares as fifty percent for the ten wrap notes in dispute here. *See id.* at 11.

---

Agreement." Pffs.' Ex. 18(A), at 1, ¶ 1 (ECF No. 46-18) (2007 Assignment to PCH); Pffs.' Ex. 18(B), at 1, ¶ 1 (ECF No. 46-19) (2007 Assignment to Barrington).

The 2007 Assignments thus use considerably broader language than the 2007 Agreement. And when the Court views the 2007 Assignments' language in the light most favorable to Barrington and PCH, the language suggests that the parties understood Raintree's interests from the 2003 Agreement to be more expansive than proceeds from refinancings, sales, or cash flow for the notes.

Thus, Barrington and PCH contend that they have a right to fifty percent of all proceeds. And if Barrington and PCH are correct, and if CFS ends up collecting on the collateral, then Barrington and PCH's interests include proceeds realized after CFS collects on the collateral. Sufficient evidence—when viewed in the light most favorable to Barrington and PCH—shows that their interpretation is reasonable.[12]

> ### a.  *Barrington and PCH's Surplusage Argument*

Barrington and PCH read paragraph 7 to "broadly provide[] that Raintree will participate in the 'proceeds' of the Wrap Notes." ECF No. 46, at 21. They emphasize that a court "will not interpret a contract such that [its] interpretation of a particular clause or provision will annul other parts of the document, unless there is no other reasonable interpretation." *Id.* (alteration in original) (citing *Pub. Serv. Co. v. Diamond D Constr. Co.*, 2001-NMCA-082, ¶ 19, 33 P.3d 651). Put differently, Barrington and PCH make a similar surplusage argument for paragraph 7 that CFS makes for paragraph 8.

Once again, here are the two provisions:

- <u>Paragraph 7</u>: The participation in proceeds of each of the All-Inclusive Residual Notes for each apartment project is set forth in Exhibit "A".

- <u>Paragraph 8</u>: Proceeds from any refinancing, sale, or cash flow for the Notes shall be distributed directly from escrow to the Wrap Note Lenders in accordance with the percentage interests listed on Exhibit "A".

ECF No. 45-7, at 5, ¶¶ 7-8. If paragraph 8 limits the parties' interests, then Barrington and PCH contend that paragraph 7 becomes surplusage—a result disfavored in New Mexico. It is not a solution to claim that paragraph 7 defines how the parties will share proceeds and that

---

[12] The words of caution in note 6, *supra*, apply here as well. The Court's citation to a fact in support of Barrington and PCH does not mean that the fact would be dispositive at trial. So too, the Court's omission of a fact does not mean that the fact would be immaterial at trial.

paragraph 8 defines which proceeds the parties will share. After all, paragraph 8 itself notes that the parties will share proceeds in accordance with Exhibit A.

Barrington and PCH claim to harmonize the paragraphs. Paragraph 7, according to Barrington and PCH, gives Raintree broad participation rights. *See* ECF No. 46, at 21. Meanwhile, paragraph 8 (claim Barrington and PCH) merely defines how certain proceeds should be disbursed—from escrow. *See* ECF No. 57, at 9-10. This resolution is reasonable, especially when the Court views the evidence in the light most favorable to the plaintiffs.

b.    *Raintree's Prior Rights*

Raintree held broad rights under the parties' earlier agreements. The 1982-83 Participation Agreements states that Raintree had a "50% interest in that portion of the Residual Note that represents Contract Equity including a *50% interest in all Collateral* that secures the Residual Note." ECF No. 45-1, at 2, ¶ 2 (emphasis added). The 1996 Agency Agreement recognized that "Raintree owns a fifty (50%) interest in the Notes and *a fifty percent (50%) interest in the collateral* securing the Notes." ECF No. 46-8, at 1, ¶ 2 (emphasis added). And the 1998 Agreement gave Raintree a fifty percent interest in "*all such proceeds*" from "proceeds attributable to any of the Notes." ECF No. 45-5, at 2, ¶ 2 (emphasis added). In sum, Raintree had a right to share in proceeds beyond just those from any sale, refinancing, or cash flow for the notes. These rights included sharing in proceeds from the collateral.

It is true that the 2003 Agreement extinguished these rights. *See supra* Section III.A. Still, these prior rights provide context for the 2003 Agreement. And when the Court views this context in the light most favorable to the plaintiffs, the Court would have expected Raintree to have given a more-explicit renunciation of its prior rights. In other words, this context (when

viewed in the light most favorable to Barrington and PCH) is more supportive of paragraph 7 conferring broad rights on Raintree rather than paragraph 8 limiting Raintree's rights.

c.      *The 2007 Assignments*

The 2007 Assignments from Raintree to Barrington and PCH clarify Raintree's understanding of the 2003 Agreement. These assignments stated that Raintree was conveying "a 50% ownership interest in and to the Raintree Participation Right and in all rights and remedies in connection therewith (including, without limitation, the rights to principal and interest payments) and all collateral and security therefor as set forth in the applicable Security Agreement." Pffs.' Ex. 18(A), at 1, ¶ 1 (ECF No. 46-18) (2007 Assignment to PCH); Pff's . Ex. 18(B), at 1, ¶ 1 (ECF No. 46-19) (2007 Assignment to Barrington). This language suggests that Raintree thought it had a right to more than proceeds from a sale, refinancing, or cash flow for the notes—including a right to share in the collateral.

And this evidence—when viewed in the light most favorable to Barrington and PCH—supports Barrington and PCH's interpretation. The 2007 Assignments show that Raintree believed it held broad rights to the wrap notes. And the fact that Raintree held this belief in 2007 increases the likelihood that the 2003 Agreement actually preserved Raintree's broad rights. Said otherwise, Raintree's 2007 belief increases the reasonableness of plaintiffs' interpretation.[13]

d.      *Mr. McKeon's 2016 Email*

In 2016, Mr. McKeon (writing on behalf of CFS) emailed Barrington and PCH's manager. He wrote, "Raintree has a 50% interest in 'Contract Equity' and the 'Collateral,' by a separate contract on each Note." Pffs.' Ex. 19, at 2 (ECF No. 46-20); ECF No. 50, at 6, ¶¶ AMF

---

[13] The language in the 2007 Assignments seems to be in conflict (at least for purposes of this dispute) with language in the 2007 Agreement. To summarize Section III.C.1.d, *supra*, the 2007 Agreement supports the reasonableness of CFS's interpretation of the 2003 Agreement when CFS benefits from the most-favorable light.

L, M. This email, of course, does not modify the 2003 Agreement. Nor does it even define the 2003 Agreement. But when the Court views the email in the light most favorable to the plaintiffs, the fact that Mr. McKeon believed that Raintree had interests in the collateral increases the likelihood that the 2003 Agreement actually gave Raintree these interests. In other words, Mr. McKeon's 2016 belief increases the reasonableness of interpreting the 2003 Agreement as preserving Raintree's rights to proceeds from the collateral.[14]

        *e.*        Krieger v. Wilson Corp.

*Krieger v. Wilson Corp.* supports Barrington and PCH's reading of the 2003 Agreement. *See* 2006-NMCA-034, 131 P.3d 661. In that case, a lessee leased a restaurant in a larger building owned by the lessor. *See id.* ¶ 1. The lease agreement stated, "Lessee . . . agrees to indemnify and hold Lessor . . . harmless from any and all claims . . . ." *Id.* ¶ 10. The agreement also stated that "[t]he Lessor does hereby . . . lease unto the Lessee the restaurant portion only of the Lessor's building at the B&W Truck Stop." *Id.*

A defect in the building's parking lot injured one of the restaurant's patrons. *See id.* ¶¶ 2, 16. The lessor (the building owner) settled the patron's personal injury claim but sought indemnification from the lessee (the restaurant owner). *See id.* ¶ 2. The district court found the lease agreement to be clear. Because the lease agreement was limited to the "restaurant portion only," the district court held that the indemnity provision did not require the lessee to indemnify the lessor. *See id.* ¶¶ 11, 12.

The New Mexico Court of Appeals reversed. According to the court, a reasonable juror could read the "any and all" indemnity provision to trump the provision limiting the lease to the

---

[14] CFS highlights that Mr. McKeon is a lay person. *See* ECF No. 49, at 4, ¶¶ 28, 29. When the Court views the evidence in the light most favorable to CFS, Mr. McKeon's email is less supportive of the reasonableness of plaintiff's interpretation.

"restaurant portion only." *Id.* ¶¶ 16, 20 ("We cannot say as a matter of law that the Lease is susceptible to only one reasonable interpretation. . . . Although the Lease is for the restaurant portion only of the truck stop, there is no language limiting the agreement to hold harmless and indemnify to claims physically occurring within the leased premises only.").

To be sure, *Krieger* is not on all fours with this case. But it offers a key lesson. When a contract does not resolve a potential conflict between two clauses, a reasonable juror can favor a broader provision—the indemnification clause there, paragraph 7 here—over a narrower one— the lease limitation there, paragraph 8 here. This is not to say that the juror would be correct. But if the juror's interpretation is reasonable, then the contract is ambiguous, and the correct interpretation becomes a question of fact. *See C.R. Anthony Co.*, 1991-NMSC-070, ¶ 17.

### f.      Conclusion of Barrington and PCH's Interpretation

The plaintiffs offer a reasonable interpretation of the 2003 Agreement: Barrington and PCH have a right to fifty percent of all proceeds from the wrap notes, including proceeds derived from any collateral after collection.

Barrington and PCH thus meet their initial burden on their motion for summary judgment. By providing a reasonable interpretation, the plaintiffs make a prima facie showing that they are entitled to judgment as a matter of law. And when the plaintiffs benefit from the Court viewing the evidence in the light most favorable to them, they survive CFS's motion for summary judgment. That is, by providing a reasonable conflicting interpretation to CFS's interpretation, Barrington and PCH highlight a genuine issue of material fact.

**IV.    Conclusion**

The 2003 Agreement is susceptible to reasonable but conflicting interpretations. As a result, the 2003 Agreement is ambiguous, and a genuine issue of material fact exists. **IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED** that

1. *Capital Fund Securities' Motion for Summary Judgment* (**ECF No. 45**) is **DENIED**; and

2. *Plaintiffs' Motion for Partial Summary Judgment* (**ECF No. 46**) is **DENIED**.

**IT IS FURTHER ORDERED** that

1. Plaintiffs resubmit their proposed pretrial order with any revisions to the Defendant within **five business days** of the entry of this memorandum opinion and order; and

2. Defendants resubmit the consolidated proposed pretrial order with any revisions to the Court within **five business days** of Defendant's receipt of Plaintiffs' proposed pretrial order.

_____
SENIOR UNITED STATES DISTRICT JUDGE